Case number 171701, Ronald E. Wallace and others versus Esperion Therapeutics Incorporated and others. Arguments not to exceed 15 minutes per side. Mr. Hubachek for the appellants. Good morning, your honors. Steve Hubachek, Robbins Geller on behalf of the movements appellants. Your honors, I'd request to reserve three minutes for rebuttal. Your honors, on September 28, 2015, defendants Esperion and Malibin demonstrated that their statements on August 17 of that same year regarding the FDA-Esperion meeting in early August of that same year were false. They did so by making clear that the FDA had not agreed that Esperion's medication for the high unmet need population could be approved prior to the completion of a cardiovascular outcomes trial, or CVOT. They also made clear that the FDA had not decided that the risk-benefit ratio for that high unmet need population was appropriate, and they also made clear that the FDA had not confirmed that LDL cholesterol reduction would remain an appropriate surrogate endpoint for Esperion's trials. But on August 17, they said the opposite as to each one of those facts. Now, your honors, under PR Diamonds, this court presumes that the top executives of a company are aware of the most important facts regarding that company, and there were no facts more important to Esperion than the FDA approval of its medication. Second, all of the statements that I've just described described what happened in early August. They are statements of historical fact, so they are not forward-looking statements covered by Safe Harbor. Now, your honors, there's a dispute between the parties as to the significance of the minutes of the FDA meeting that were revealed just prior to the September 28 statements. The defendants argue that that was a new fact that the defendants couldn't have been aware of when they spoke on August 17, but that doesn't jibe with what the FDA describes these meetings, excuse me, those meetings minutes as fulfilling. The FDA's guidance says that those minutes are the official record of what transpired at the meeting, so what they are is the official record of what happened in early August. They're not new facts that were learned only in September of 2015. They don't transcribe it, this is just the minutes of the meeting. I agree, your honor, it's not a transcript, it's the minutes of the meeting, but as was made clear in the statements that Esperion and Mr. Male have been made, those discussions between the FDA and Esperion were clear, they were well understood, and Esperion said that we wanted to provide information to shareholders early because it's really important information. Does Esperion claim that it was discussed at the meeting and that the minutes don't really reflect what happened at the meeting? No, they didn't say that. What they did say was that their statements on August 17 were based upon the information conveyed to them by the FDA, and that's in paragraph 29 of the complaint. They said based on feedback from the FDA, the approval of ETC 1002 will not require the completion of a CVOT, but then in September 28, when they were making these statements and they're getting all this pushback from the analysts who had recognized the extreme discrepancies between the August 17 statements and the September 28 statements, Esperion and Mr. Male have never said, well, the FDA got it wrong or the FDA changed their mind. There's no indication from them at all that the FDA had somehow pulled the rug out from under them. So basically we have a situation where they just simply said something completely different about the same meeting in two separate statements that are only a month apart. I think that the analysts' contemporaneous reactions pretty much demonstrate the very substantial discrepancies between the two. Particularly if you look at the one statement, they're saying that the FDA had confirmed, in the past tense, the FDA had confirmed that the surrogate endpoint would remain acceptable. Well, later on when they were explaining their statements on September 28, they said, well, now there's doubt about whether or not LDL cholesterol reduction will continue to be an acceptable surrogate endpoint. So those two statements, they just can't go together. I know that you indicate that the reactions in the statements of the analysts really support an inference that these statements were knowingly false. And I mean, knowingly false position that you want us to adopt to whether from a, I think, an equally possible inference that they were simply reckless or just inaccurate. I mean, because you want us to take a higher characterization of these were knowingly false and made really with the intent to influence a Well, Your Honor, first off, as long as the inferences are equal, then the complaint should be sustained. That's number one. Number two, we are claiming knowledge or recklessness either way. And I think that the basis for finding knowledge or recklessness here are the very sharp distinctions between what they said on the two different occasions. As I was just pointing out, there's a big difference between the FDA confirmed that LDL cholesterol reduction can be a surrogate endpoint and will continue to be, versus the explanation that Mr. Mailoban gave in response to the analysts' questions about that very same discrepancy where he said, well, you know, there's doubt about whether it will continue to be an accepted surrogate endpoint. So there's very sharp distinctions between what they said. That's number one. Number two, the defendants in their brief say that Mr. Mailoban may have been confused. He may have misunderstood. If you're confused or not exactly sure what you heard, you can't say on August 17 the sorts of very definitive statements that Mr. Mailoban made. For instance, he said, we know that they will not require us to complete the CVOT before getting approval. And that's at paragraph 32. We know is a very strong statement. It's not, you know, we interpreted them to mean this, or we think this is what they mean, or as the district court found, this is what the history suggests to us. They said, we know. The FDA never before required this test, did they? Your Honor, there was a history of the FDA not, I agree with you, that there was that history. Can they rely upon that? They didn't. What they said was, in paragraph 29, they said, based on feedback from the FDA. Now, Your Honor, I think that if Mr. Mailoban had come out and said, like Your Honor just suggested, based upon the history here, we think that if this is going to continue to be an accepted surrogate endpoint, then we would have a very different case. But that's not what happened. It's forward looking, I suppose. Well, Your Honor, it's not forward looking when you're saying what was said to me on, like, if I just repeated Your Honor's question, you know, that would just be a statement of the historical fact. And that's what happens here, is that this meeting between Asparian and FDA occurred in early August, and they gave an account of that meeting. That's backward looking, not forward looking, and they said what it was that FDA said to them. FDA confirmed. That's a statement that they made that's in the past tense, even. So it's definitely not forward looking statements. And I think if you look at this Court's decision in Miller that the defendants rely on, you have a very careful analysis where this Court parsed out each portion of the statement and identified forward looking portions. And that's not the sort of analysis that occurred here. The district court just simply said, this is an assumption underlying a forward looking statement. It never even said what the forward looking statement is. But the bottom line is, is that we have statements of historical fact here. Yes, Your Honor. Did they get off the hook because they put this caveat, your caution not to place undue reliance on the forward looking statement because we don't have the minutes yet, or something to that effect? Your Honor, I don't think under any circumstances that you can give a that would warn investors that what we just said may not be true. For instance, they stood up there and they said the FDA considers this to be an acceptable surrogate endpoint. But they may not really have considered it to be a surrogate endpoint. That just doesn't make any sense, Your Honor. So I think that, and that's really what they said in quality systems. They said that if the present statements are simply false, the only way to give an adequate warning is to admit that they're false. And that didn't happen here. But I guess the other point, Your Honor, is these statements aren't forward looking. So we don't even really need to get to that question. Your Honors, I'd also like to briefly address the Couillat case, which the district court relied on, which I think is entirely distinguishable from this case. Here we have a situation where the defendants are just simply saying, Mr. Malebin was confused. Although, even if he was confused, the fact that he used such definitive language was entirely reckless. And we've cited, I think, the Second Circuit case, Rolfe. It's also language in this court's Helwig case, where this court quotes, I guess, Dean Prosser, regarding statements where you don't really have a basis. So I think it's reckless in either regard. But in Couillat, there are actual facts that the defendants could point to. In Couillat, they wanted to change from an intent to treat population to a modified intent to treat population. And when it turned out that the FDA really only wanted the ITT, or intent to treat population, the defendants in that case were able to point out to the fact that they had submitted an application asking to use the MITT population, and the FDA accepted that. And so this court found that that acceptance by the FDA gave the company reason to believe. So that's actually a fact that was in the record that you could draw an inference about the company's belief. But there's nothing in this record that supports that sort of thing. The defendants just want to say, well, he got everything wrong in September 28 compared to August 17. So therefore, he must be confused. And they're doing that without pointing to record evidence, as they did in Couillat. I'd also like to point out that in addition to this court's decision in PR there's divergence between what the defendants were told as revealed in the FDA minutes that they spoke regarding on September 28. There's disregard of the most current factual information. Because when they spoke falsely on August 17, the meeting that they spoke falsely about had occurred only the week before. So the meeting was the most recent information that they had had. And there's also the question of closeness in time. They had to reveal the falsity of their statements basically only a month later. In addition, I think that the fact that Mr. Mailoban's compensation depends upon the stock price is also a supporting fact. And I would point out that even though there are no insider trading in this particular case, in the Supreme Court's decision in Tell Labs and then the Seventh Circuit's follow on, they had basically the same situation where there was no evidence of stock sales. But both of those courts found that there was sufficient evidence to support a Sioner inference. When's the court supposed to look at these Helwig factors? Can they look at it on a motion to dismiss? Yes, Your Honor, they can look at the Helwig factors on a motion to dismiss. And I think that they support the inference here. But really, I think PR Diamonds, the statement of PR Diamonds is the closest thing here, where it says high-level executives can be presumed to be aware of matters central to their business's operation. And that's at 364, Fed Third at 688. And that basically hits the nail right on the head. The Seventh Circuit has a similar analysis in Maycor. And the Fifth Circuit has a similar analysis in Nathanson. And unless Your Honors have any further questions, I'll reserve my remaining time.  Good morning, Your Honors. What my colleague did not discuss, and what I think Judge Donald's question was getting at, is Sienter. Sienter in this case, under this court's precedent, is an independent basis for dismissal. And what plaintiffs don't discuss is that the Private Securities Litigation Reform Act has a heightened pleading standard for Sienter that is intentional fraud or recklessness within the circuit, but it is a strong inference. Meaning, this court has to balance under the Supreme Court precedent and tell-abs and find that the inference of fraud is equally as cogent and compelling as the non-fraudulent inferences. And here, what we have, much stronger than in this court's Doshi case in 2016, where there was a finding of no Sienter on several of the Helwig factors being present, but still no Sienter. Here, there are zero factual allegations that get to Mr. Maleben's state of mind in August when he made these statements and he said, we can only speak as it relates to what we think we're hearing. But we have to wait for the FDA's minutes, which everyone knows under the guidelines come 30 days later, and we will update you when we get those. And nothing said at that meeting that would make him think this, is there? Because the minutes showed that they were gonna have to go through this CVOT, right? I'm sorry, Your Honor, the first part of your question I couldn't hear? Well, he couldn't have been mistaken about what happened at that meeting, because the minutes show that that's not what happened. Actually, Your Honor, the minutes don't show that. The minutes are not in the record in this case. What's in the record in this case. That's what they claim, anyway. Plaintiffs claim they don't have the minutes, they haven't seen the minutes, and the minutes aren't here. Plaintiffs claim the inconsistency with the company's description after receiving the FDA's minutes, which it acknowledged in August are the only minutes that matter, which is why they said we have zero percent, front-running the FDA on this, and the FDA's minutes are the only ones that matter, we're gonna wait for them. After those minutes were received, Esperion's September statements clarified that the future event, whether FDA will or will not, require the cardiovascular outcomes trial to be completed, that it could happen. In other words, the inconsistency that plaintiffs point to are the two company statements, but they don't allege any facts whatsoever. This is a one-month fraud that makes no sense. They don't allege any benefit. They talk about motives generally, such as counsel just mentioned, compensation, but the stock price declined by 15% the day after the August statements and conference call, and continued to lose 50% of its value by September 25th, before the September 28th statements. They don't allege Mr. Maileben had any personal benefit in compensation. They don't- Is that a requirement, does that show that the speaker benefited from it? Motive and opportunity are not required, but the absence of motive is provative to the lack of scienter. What is required, though, your honor, is particularized facts that gesture Mr. Maileben's state of mind. They don't have the usual methods here, which are confidential witness statements talking about internal disagreement. Plaintiffs point to a divergence, the Helwig factor between internal and external statements, but they don't point to any internal statements. In other words, what it amounts to is because August and September are inconsistent statements, defendants must have known and must have formed a strong inference of scienter intent to mislead. Recklessness in this circuit is akin to conscious disregard, and this court has repeatedly required things, multiple red flags that are willfully ignored. Those that were present in Doshi, even with millions in incentive compensation that were received, and that the alleged accounting fraud was over many years and huge in scope, this court still found no scienter because there was nothing showing at the time the statements were made, which is critical, at the time the statements were made that Mr. Maileben had any intent to mislead. In fact, everyone knows when there's a verbal meeting that there's the potential that people come away with different understandings. And what Asperion actually disclosed in August was in the more limited patient population, this is the heterozygous, I don't wanna make it difficult for the court, but it's H-E-F-H, it's heterozygous familial hypocholesterolemia, it's an ASCVD, which is arteriosclerotic cardiovascular disease. This is a narrower group of patients who while on statins are not able to lower their cholesterol. So that's why they describe that as a high unmet medical need. What Mr. Maileben said in August was, as to that high unmet medical need population, we can only speak as it relates to what we think we're hearing, and we need to wait for the FDA minutes, which will have FDA's official position, Your Honor. But what we think we're hearing is that a cardiovascular outcomes trial will not be required to be completed, Asperion said at starting it. He didn't say what we think we're hearing, he said, we know. The quote from the analyst call and the page ID at 646, Your Honor, is we can only speak as it relates to what we think we're hearing. I agree with you that in the press release. I'm not saying that that isn't there, that that statement isn't there. But I am suggesting that as I read this record, he did say, we know that 1002 will not require a CV outcomes trial to be complete prior to approval. Correct, that is the wording of the press release, and that's the forward looking statement of will not require completion of the CVOT. But Your Honor, what it doesn't show that statement is the state of mind of Mr. Maiben. I want to bring it back to that because what's utterly absent here is any fact as to why he would say anything but what the company is understanding. In all the cases that plaintiffs cited where there is some understanding of CNTR, there are far more clear facts  Here, there's not a witness, not a document, not any internal anything that says that Aspirion didn't 100% believe in good faith what it was saying in August. In other words, they gave an update, which is the purpose of the forward looking statement, safe harbor, Congress's intent was to encourage companies to make these statements. They gave an update because this is what they believe they were hearing. But they were clear that they were not giving FDA's definitive position. And that's where the warning does matter, Your Honor, because the warning was, we don't want to get out in front of FDA. We have no interest in getting out in front of FDA. And counsel mentioned they didn't complain about the minutes once the minutes came and seemed inconsistent with what FDA had said verbally at the meeting. Well, Aspirion has no interest in criticizing the FDA and had it challenged the minutes, there's nothing stopping FDA from changing its position and requiring a cardiovascular outcomes trial the next day. In other words, the history here does matter as it did in Couillat. In Couillat, Biomimetic knew that other drugs had obtained approval on the modified intent to treat population. Here, counsel said Aspirion didn't rely on that history. We did. When we're saying remains a surrogate endpoint, that's exactly what that refers to, which is for 30 years, FDA assumed that lower cholesterol is a good thing for heart health. And the reason for this first release in August. Good question, Your Honor. To say that they had a meeting, if they could have said that, they couldn't have even alleged any kind of fraud. Said, we had a meeting and the FDA will soon, through its minutes, tell what happened. That's it. Couldn't they do that? They could have said nothing, Your Honor, but what Congress intended. That's not saying nothing, it's just saying we've had a meeting and they will put it down, you know? Right. Then they'd be off the hook, right? They absolutely could have, Your Honor. And what they did here is to go further and say what, as they said, what we think we're hearing FDA's position is as to whether in the future it will require the CVOT to be completed. And Your Honor, what's important about CNTR is it has to be ascertained at the time the statements were made. And plaintiffs here don't say, Esperion knew, Esperion had a meeting. Mr. Maleben was incentivized to lie. It makes no sense that he would not say what Esperion honestly believed in August at the time he was promising, we will update you once we receive the minutes in 30 days. Knowing they would update in 30 days, that is a fraud that makes no sense, Your Honor. And this comes back to the telebs balancing that the court must do. The inference of non-fraud is far more compelling and cogent here. What Esperion did was try in good faith to get what it believed was important information out in August. When you're right, Your Honor, they didn't have to. They could have waited 30 days conservatively for the minutes to confirm what they think they heard FDA's position. We attached as Appendix A to our brief the June right before the August meeting that FDA had a panel that did a similar thing for a similar drug. Amgen had a drug, Repatha, and that surrogate of lower cholesterol is a good thing for heart health was used to approve Amgen's Repatha drug, again, in this narrower set of people who can't get their cholesterol down with existing statins. So it just happened in June. 30 years of history of FDA-approving cholesterol drugs that only claim, by the way, to lower cholesterol. They're not claiming heart health. The reason Mr. Maliban knew that this was what he believed is it was utterly consistent with what FDA had done for 30 years. And importantly, the reaction, count- Was that in the release that they've always done this in the past and therefore they're gonna continue- Remains a surrogate endpoint is the reference to, you can use cholesterol as a surrogate for heart health. Yes. So they did rely on that in the release. And then they discussed it extensively in the conference call, in the analyst conference call. And what they said was, in this high unmet medical need, FDA can look at the risk-benefit ratio of the drug and say these patients aren't being helped by existing drugs, and therefore we think they will continue in the future to use LDL cholesterol lowering as a surrogate endpoint. And so getting back to Sienter, at the time Mr. Maliban made these statements, plaintiffs talk a lot about the inconsistency, but they don't allege a single fact that lets this court take a strong inference. It's a strong inference of Mr. Maliban's state of mind. So his state of mind is, we have 30 years of precedent where FDA has done this. June, they just did it again for Amgen's drug, in this high unmet medical need population. And we think this is what we're hearing, but we're cautioning you that the minutes may differ. And getting to your honor's question, there was an interesting question from one of the analysts in the August phone call. It's towards the end of the call, and the analyst says, you keep referring to FDA's minutes, might there be surprises there that are different than say the company's notes? And Mr. Maliban says, that's exactly why I keep saying, we have to wait for the minutes. I know your honor would be shocked that after 30 days, a federal agency may come out with an official position in writing that is more declarative in writing than people's understanding walking away from a verbal meeting. That's just human nature. There's not a single fact alleged. In fact, they don't even allege Mr. Maliban was at the meeting. The amended complaint paragraph 26 says representatives, and plaintiffs spend a lot of time in their brief assuming he attended the meeting, but it's not actually alleged. So there is zero allegations getting at his state of mind short of he has compensation based on stock price, which declined. He didn't attend the meeting at all. It's not in the record, your honor, but no, he didn't attend the meeting. If they claim it, I suppose that you could say, well, they've alleged it and we'd have to go further. Correct, but they don't allege he was at the meeting is my point. They don't allege anything that- There's somebody there for him, I suppose. The company absolutely attended the meeting. And we're not backing off from Mr. Maliban as the one that spoke. We own that he spoke. What we're saying is his state of mind is the only one that matters here. He's the only speaker. And they allege zero facts that say he didn't honestly believe what he was saying in August. There are many quotes in Couillat, but the important ones are that merely looking backwards and saying that inconsistencies do not mean that they lied earlier. The Federal Mogul case, I believe, says honest optimism, while it may turn out to be mistaken, like in Couillat, is not fraud. So the strong inference, I'm sorry. Let's say that I understand that you say that there's no allegation that he attended and you've made a number of other statements, but isn't it the case that the more central a matter to a business's operation, the more high-level executives can be presumed to be aware of a whole range of matters tending to support an inference of scienter on the part of that executive here, Mr. Mailoban? Yes, and the core operations doctrine has never alone, without more, been enough for scienter. But we're not saying Mr. Mailoban wasn't aware. We're saying he was wrong, but not fraudulently, or with extreme recklessness, which in this circuit is akin to conscious disregard. Recklessness is so far from negligence that is a lesser form of intent, and plaintiffs have to plead particularized facts that show what Mr. Mailoban disregarded. The reason I was emphasizing they don't allege he was at the meeting is it shows they have zero allegations as to his state of mind. Thank you very much, Your Honor. Thank you, counsel. Your Honor, counsel says that the statements are not definitive and they're merely honest optimism. But all these facts are definitive factual statements. They don't bear any sort of ambiguity at all. Mr. Mailoban said, we know that they will not require a completed CVOT. He said FDA confirmed. Those are not speculations on his part, interpretations of history. Those are definitive factual statements that he made, which are certainly not honest optimism. I note that in their brief, and again today, there's really no discussion at all from the defendants of the PR Diamonds case and the rule that this court elucidated in that case, which says that in a situation just like this, where you have the highest executive and the most important facts to the company, that you can presume that the executive knows. But you don't have to just presume. If you look at his language during his statements, he repeatedly talks about his own personal knowledge about the meeting. The information we learned last week, that's at paragraph 31. The information we digested the meeting last week, and that's also at paragraph 31. The thing that we had learned, that's in paragraph 31 as well. Paragraph 32 has the we know statement. Paragraph 31 also has, we found the FDA review team to be clear. And then paragraph 33 refers to what they've told us. He repeatedly, and over and over again, emphasizes his own personal knowledge regarding what happened. And let's say- Well, when someone is speaking on behalf of an entire organization, I mean, can't you kind of also presume he might be using the editorial we? I suppose that's an inference that your honors could draw, but it certainly isn't more compelling than I think what is the natural meaning, which is that we, meaning me, and the rest of the high-level executives in the company, are aware of this information. And I'd also point out that the inference that we're asking this court to draw is that what was said in the minutes is what was said in early August. That is a reasonable inference to draw, and much more appropriate, I think, than the defendant's proposed inference, which is that, well, they might have switched everything around and pulled the rug out from Asparian, even though Asparian never said that. And it's also important to keep in mind that the FDA guidance itself, not only do they say that these minutes are the official record, but they also set out a summary process by which the person, the applicant, needs to lead the summary between them and the FDA on the important points so that there's no confusion. Well, Mr. Mailman came out in August 17 and said these are the important points. So the inference there is is that those were the points that they summarized, and so therefore, he knew what the true facts were regarding that. And then lastly, Your Honors, recklessness is enough, too. Definitive statements, even if he was somehow confused, are insufficient, so therefore, I think that the complaint should be sustained.  Thank you, Your Honors. Case will be submitted.